NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260378-U

NO. 4-26-0378

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Boone County |
| SHADI SHEHADEH, | ) | No. 26CF41 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan A. Swift, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in granting the State's petition to deny defendant pretrial release under the dangerousness standard.

¶ 2    Defendant, Shadi Shehadeh, appeals the trial court's order denying him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2024)). On appeal, defendant argues the State failed to prove by clear and convincing evidence that (1) the proof was evident or the presumption great he committed a detainable offense, (2) he posed a threat to the safety of any person or the community, or (3) no condition or combination of conditions could mitigate any such threat. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                  A. The Charges

¶ 5    On February 11, 2026, the State charged defendant with one count of criminal

sexual assault (count I) (720 ILCS 5/11-1.20(a)(1) (West 2024)) and two counts of criminal sexual abuse (counts II and III) (*id.* § 11-1.50(a)(1)). In count I, the State alleged defendant used force to commit an act of sexual penetration with V.A.K. (born in 1976). In counts II and III, the State alleged he used force to commit an act of sexual conduct with V.A.K. Each count related to the same incident, which allegedly occurred on December 5, 2025.

¶ 6            B. The Detention Petition and Pretrial Investigation Report

¶ 7            The State filed a petition to deny defendant pretrial release based, in part, on the dangerousness standard—we note that the State also sought to detain defendant under the willful flight standard, but the trial court found it failed to carry its burden with respect to this standard, and we therefore find it unnecessary to discuss it further.

¶ 8            The State proffered in its petition that "V.A.K. met the defendant on Facebook Dating, and they had been talking for about a week before deciding to meet [for dinner] on December 5, 2025." The State further proffered that:

> "After having dinner, the defendant convinced V.A.K. to come back to his residence. There, the defendant asked if he could kiss her, and she consented. However, the defendant then put his hands under her shirt, and began to fondle her breasts. She told him to stop, but he did not. The defendant then put his hands down her pants. She again told him to stop, but he did not, and continued on to penetrate her vagina."

In asserting no conditions could mitigate the threat defendant posed, the State proffered the following:

> "a. [D]efendant scored a zero on the Revised Virginia Pretrial Assessment Instrument [(VPRAI-R)]. Even if he were to be released with a condition that he

report to Pretrial Services as directed, the only things that includes is that he report a change of address, or any police contact.

      b. There is no way to monitor if defendant continues to use Facebook Dating, or any other dating apps to meet with other women.

      c. *** [A]s noted in *People v. Schrock*, 2024 IL App (5th) 240507-U, these types of crimes are usually committed in private. [Citation.] There is no way to monitor the defendant to ensure that he does not commit further similar acts."

The State further proffered that "defendant is a resident of the State of Florida, and indicated to Pretrial Services that he intends to reside there if he is released." He "had also been in a relationship with another woman, and had been living with that woman and her aunt" prior to the alleged assault.

¶ 9      The State filed a pretrial investigation report. According to the report, defendant was 42 years old and employed at the time of the offense. He lived in Florida with his wife and two children. At the time of the alleged assault, he was in Illinois for a temporary work assignment. Defendant had no criminal history, nor did he have a history of substance abuse or mental health issues. He scored a 0 out of 14 on the VPRAI-R.

¶ 10      C. The Detention Hearing and Detention Order

¶ 11      At a detention hearing, the State proffered the information set forth in its petition. In addition, it proffered that during the early morning hours of December 6, 2025, V.A.K. went to the hospital and, while there, spoke with detectives. She told them that the following had occurred after her date with defendant:

"Afterwards [defendant] asked [V.A.K.] to go to his residence ***. She stated she did not feel comfortable so he told her they could just go and hang out outside of

the residence, but once there, he did ask her to come inside. She did. They started watching TV in the living room, and approximately 10 minutes into that, he asked if he could kiss her. She agreed to that. He then kissed her but then put his hand inside her shirt and started touching her breast. She asked him to stop but he didn't. He continued kissing her, then put his hands inside of her pants and started to finger her vagina. She told him to stop but he continued to penetrate *** her with his fingers, and while doing so, he also put his hand on her neck. She also indicated that he bit her nipples. He then took off his pants and started to masturbate as he was touching her breasts. He ejaculated on the left side of her breast. He went into the bathroom, got toilet paper, which he then used to wipe her off.

After that he went to the bathroom again and at that time she was able to get dressed up as fast as she could. When he came back, he asked why she got dressed and she said that she wanted to go home and she started to leave. He followed her and said that he had hoped to see her again. The victim got into her car, immediately called her daughter, stayed on the phone with her until she got home and then they both went to the hospital."

¶ 12 The State further proffered that V.A.K. met with detectives a second time to provide more details about the alleged assault and she told them the following:

"The defendant stated that the house that they were at belonged to his boss and that he had just moved here from Florida. [He] [a]lso told her that he works at Kunes in Sycamore or DeKalb. She also stated when the defendant started groping her breast and put his hand down her pants, she tried to push him away

- 4 -

and told him to stop. One of the times that he got up to go to the bathroom, she pulled her pants back on and pulled her shirt down, but when he got back, he began to masturbate. [He] [p]ulled her down so she was lying on the couch, held her down by the throat causing a bruise and then ejaculated on her breast. She also stated that he pinched her nipples and it hurt and she noted that the more that she squirmed or expressed discomfort, the more excited he seemed to get. She stated that she did consent to the kiss but nothing else. [She] [k]ept telling him that she does not do those things on a first date. She stated she was scared and she felt like she went numb. He also had during all this yanked her pants down at one point. He said to her[, ']I got you off, you need to get me off.['] She felt like he was not going to let her go until it happened. He pulled her over and said[, ']you know you want to touch it, come over here, you can get me off now.['] He then put her hand on his penis and he masturbated with one hand while putting his other hand down her pants."

The State concluded its proffer by noting that defendant had been interviewed by the police and "admitted to the sexual acts but stated they were all consensual."

¶ 13     Defendant also provided a proffer at the hearing. He noted that he had "submitted to an interview" with the police and told them that the acts were consensual. Defendant asserted he "was not aware that there was a warrant [for his arrest] so he was not able to turn himself in, but had he known, he *** would have done so." Defendant further proffered that he had been offered a job in Florida, where he would live if granted pretrial release. Lastly, he proffered that he was the sole provider for his family and his wife and daughter were "insulin dependent and he is the individual who provides the financial resources *** to allow that to happen."

¶ 14        In arguing defendant was a threat to the safety of V.A.K. and the community, the

State asserted, "Based on the facts of this case, I do believe the defendant is a risk not only to the

victim in this case but also to the community, wherever that community is, whether he's here or

somewhere else." Citing this court's decision in *People v. Romine*, 2024 IL App (4th) 240321,

the State further asserted, "[T]his is a departure from the basic expectations of civil society and

the trial court is not obligated to release such a defendant in hopes that his otherwise spotless

record will negate the real and present threat he poses to the safety of the community."

¶ 15        In arguing that no conditions of release could be imposed to mitigate the threat,

the State asserted that if defendant were to be released, "there's no way to actually monitor him.

*** There's no way to monitor if he is using the internet or any apps to contact and hook up with

any other women or meeting them in person for that matter." The State again cited *Romine*,

arguing, "[D]efendant's acts are such a departure from the basic expectations of civil society that

it becomes difficult to predict the defendant's compliance with court orders or even societal

norms regarding the safety of others." The State concluded its argument as follows:

>            "And if you want to talk about societal norms, Judge, the defendant is married. He
>
>            has two children. He admitted to the police to engaging in sexual activity with the
>
>            victim in this case. He also apparently had another relationship with a different
>
>            woman all in the short time that he's been here so clearly he can't comply with
>
>            societal norms. I don't think that there's any way we can assure that he's going to
>
>            comply with any conditions of pretrial release. He is certainly a danger, even
>
>            though he does not have any prior record. This is a very serious incident. It's a
>
>            sexual abuse case."

¶ 16        The trial court entered a written order granting the State's petition to deny

defendant pretrial release, finding the State had proven each element of the dangerousness standard by clear and convincing evidence.

¶ 17                                    D. Defendant's Motion for Relief

¶ 18        Defendant filed a motion for relief pursuant to Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024), arguing, in relevant part, that the State failed to prove a single element of the dangerousness standard by clear and convincing evidence.

¶ 19                            E. The Hearing on Defendant's Motion for Relief

¶ 20        The trial court conducted a hearing on defendant's motion for relief. At the hearing, the State, in response to defendant's argument that it failed to prove he was a danger to any person or the community, asserted the following:

> "The defense *** argues *** we did not articulate any specific danger outside of the charged offense. Well, the danger I think is inherent in the facts of this case. Again, *** this married man currently living and working outside of the state of his residence is searching for women on a dating app. He meets up with one that we know of and coerces and forces her into sexual contact that she tells him she does not want. I believe part of the gist of the *** *Romine* case *** is that even though we only have this one reported incident, there's no way to know how many times this may have happened or could continue to happen should he be released. That in and of itself makes the defendant a danger to any woman he may come into contact with or actively seek out for his own pleasure."

¶ 21        In response to defendant's argument that it failed to prove no conditions of release could mitigate any potential danger, the State argued that defendant's "acts are such a departure from basic expectations of civil society that it becomes difficult to predict [his] compliance with

court orders," and "there's no way to monitor *** defendant to ensure he does not engage in any further similar acts." The State continued, "[T]here is no stopping *** defendant from going on any type of dating app, creating any profile under any name, meeting up with women and ending up in the same situation we have here now." Lastly, the State argued that the trial court could, and should, consider the fact that defendant was married, yet still had been living with a different woman prior to engaging in sexual conduct with V.A.K., stating: "I'm not saying *** there was anything *** nonconsensual about [the relationship with the other woman]. I'm just saying *** this is not like a one time, oops, I cheated on my wife kind of thing. He's done it more than once."

¶ 22        The trial court denied defendant's motion and provided a detailed explanation for its ruling. First, in finding the presumption was great defendant committed a detainable offense, the court began by acknowledging that "there's one person saying it happened and the other person saying it didn't happen." The court determined that V.A.K.'s version was more credible, reasoning that it was unlikely she would "put her own sexual history out there understanding that there's going to be a lot of people asking questions" only to falsely accuse someone she had just met of committing a crime. On the other hand, the court found it was reasonable to believe that a person accused of committing a serious criminal offense, such as defendant, would lie in an attempt to avoid liability.

¶ 23        Next, in addressing the dangerousness prong, the trial court determined defendant was not a danger to V.A.K. or any other specific person, but it found that he was a danger to "the community as a whole" and, more specifically, to "anybody out there that utilizes dating apps." The court articulated the precise danger as follows:

            "To me, the dangerousness here is both the manner in which the prey was found

and I guess it's six of one and half a dozen of the other. Either the *** inability when somebody says, 'no' to just take it for what it's at or the inability to understand what consent really is. And either one of those, regardless, is what's putting other people at risk."

¶ 24 Lastly, with respect to the trial court's finding that no conditions of release could be imposed to mitigate defendant's dangerousness, the court reasoned as follows:

"But the question is *** what's the risk here, and how do we mitigate that? As I went through, the whole risk here with him being out is that somebody else is going to fall prey in the same manner as which it's alleged here that V.A.K. did. I can't keep you off the internet."

The court also relied on the fact that defendant was married with children when he allegedly committed the underlying offenses, stating:

"The fact that you're married with kids is not stopping you, and so I've got to assume that if you [are] released, you're going to continue to use dating apps to do this stuff. You did it while you were married; you did it before. I mean, I'm not a court of morality here. I'm just saying that I got to assume that if you're gonna do that while you're married with kids, you're going to do that even if I say please don't do that. So there's just no way of monitoring it. There's no way for me to put any conditions."

¶ 25 Defendant appealed, and the Office of the State Appellate Defender (OSAD) was appointed to represent him on appeal. OSAD has elected not to file an appellant's memorandum to supplement defendant's motion for relief. The State has filed an appellee's memorandum.

¶ 26                                    II. ANALYSIS

¶ 27        On appeal, defendant argues the trial court erred in finding the State proved by clear and convincing evidence that (1) the proof was evident or the presumption great that he committed a detainable offense, (2) he posed a threat to the safety of any person or the community, or (3) no conditions of release could mitigate any such threat.

¶ 28                               A. The Code

¶ 29        The Code provides that all criminal defendants are presumed eligible for pretrial release (725 ILCS 5/110-2(a), 6.1(e) (West 2024)). To overcome this presumption under the dangerousness standard, the State must prove three elements by clear and convincing evidence: (1) the proof is evident or the presumption great the defendant committed a detainable offense (*id.* § 110-6.1(e)(1)), (2) the defendant poses a real and present threat to the safety of any person or the community, based on the specific articulable facts of the case (*id*. § 110-6.1(e)(2)), and (3) "no condition or combination of conditions set forth in subsection (b) of Section 110-10 of this Article [(*id.* § 110-10(b))] can mitigate *** the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case" (*id.* § 110-6.1(e)(3)). "If the State fails to carry its burden on any of these three [elements], the presumption of release remains, and detention is unlawful." *People v. Sorrentino*, 2024 IL App (1st) 232363, ¶ 32 (citing 725 ILCS 5/110-6.1(e) (West 2022)). When "the parties to a pretrial detention hearing proceed solely by proffer, the reviewing court is not bound by the circuit court's factual findings and may therefore conduct its own independent *de novo* review of the proffered evidence and evidence otherwise documentary in nature." *People v. Morgan*, 2025 IL 130626, ¶ 54.

¶ 30                               B. This Case

¶ 31        As indicated above, defendant challenges the trial court's ruling with respect to

each prong of the dangerousness standard. We will address each argument in turn.

¶ 32                                    1. *Detainable Offense*

¶ 33          First, defendant argues in his motion for relief that the trial court erred in finding he committed a detainable offense because the court "never mentioned [his] claim that the acts were consensual, never explained why it rejected that competing proffer, and never identified anything in the record that made the State's account more credible than the defense account at this proffer-only stage." However, at the hearing on defendant's motion for relief, the court (1) acknowledged defendant's claim that the acts were consensual, (2) explained why it found defendant's version of the events less credible than V.A.K.'s version, and (3) identified specific facts in the record that it believed made V.A.K.'s version more credible than defendant's version. We agree with the court's finding and reasoning. Based on the proffered evidence, V.A.K. repeatedly told defendant "no" and attempted to push him off of her. Defendant also "held her down by the throat," which would appear inconsistent with consent. Thus, we reject defendant's argument.

¶ 34                      2. *Dangerousness and Conditions of Release*

¶ 35          Defendant also argues that the trial court erred in finding he posed a threat to the safety of any person or the community and that no conditions of release could be imposed to mitigate any such threat.

¶ 36          "[D]angerousness and conditions of release are two sides of the same coin; the nature and severity of the threat necessarily determine the nature and severity of the conditions that could—or could not—mitigate the threat." *Romine*, 2024 IL App (4th) 240321, ¶ 16 (citing 725 ILCS 5/110-6.1(g) (West 2022) (listing considerations for determining dangerousness) and *id.* § 110-5(a) (listing similar considerations for determining conditions of release)). In making a

dangerousness determination, courts must consider factors such as (1) the nature and circumstances of the charged offense, including whether the offense is a crime of violence or a sex offense, (2) the history and characteristics of the defendant, (3) the nature of the threat posed, and (4) any statements made by the defendant. See 725 ILCS 5/110-6.1(g)(1)-(4) (West 2024). In "determining which conditions of pretrial release, if any, will reasonably ensure *** the safety of any other person or the community and the likelihood of compliance by the defendant with all the conditions of pretrial release" (*id.* § 110-5(a)), courts must consider factors such as (1) the nature and circumstances of the charged offense, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, including his character, family ties, employment, community ties, drug and alcohol history, criminal history, and record of appearances at court proceedings, and (4) the nature and seriousness of the threat to the community. *Id.* § 110-5(a)(1)-(4).

¶ 37          Here, we find the trial court did not err in determining defendant posed a real and present threat to the safety of women in the community. The proffered evidence showed that despite being married with two children, defendant met V.A.K. on a dating website while he was in Illinois for a temporary work assignment. After about a week of talking virtually, defendant took V.A.K. out on a dinner date and invited her back to his boss's house afterward. V.A.K. initially declined the invitation, stating she felt uncomfortable doing so on a first date, but defendant convinced her to change her mind by telling her that they would just "hang out outside of the residence." Once they were outside of the residence, he then convinced her to go inside by telling her that they would just watch a movie together. But, within "approximately 10 minutes" of entering the residence, defendant asked V.A.K. if he could kiss her, and she consented. While they were kissing, defendant, without consent, proceeded to put his hands down V.A.K.'s shirt

and pants, touched her breasts, and digitally penetrated her vagina. V.A.K. repeatedly told defendant "no" and attempted to push him off of her, but defendant did not stop. At one point, defendant "held her down by the throat causing a bruise and then ejaculated on her breast." V.A.K. later told detectives that "the more that she squirmed or expressed discomfort, the more excited he seemed to get." The State also proffered that defendant had been living with a different woman shortly before meeting V.A.K.

¶ 38    Based on the proffered evidence concerning the nature and circumstances of the charged offenses and defendant's personal history and characteristics, we find (1) defendant exhibited alarming signs suggesting a propensity for sexual aggression, (2) he was actively using the Internet to meet women in the community where he was a temporary worker, and (3) the events described by V.A.K. depict a situation in which defendant persuaded a reluctant V.A.K. to enter his residence, where a sexual assault then took place. Thus, we find the trial court did not err in finding defendant posed a real and present threat to the safety of women in the community.

¶ 39    We similarly find the trial court did not err in determining no conditions of release could mitigate defendant's dangerousness. In so finding, we acknowledge that defendant scored a 0 on the VPRAI-R and told detectives that the acts at issue were consensual. However, as discussed above, defendant's claim of consent was not credible considering the proffered evidence, and courts are not required to release "a defendant in the hopes that his otherwise spotless record will negate the real and present threat he poses to the safety of the community as shown by the State's evidence." *Romine*, 2024 IL App (4th) 240321, ¶ 20. Other factors listed in section 110-5(a) of the Code—such as the nature and circumstances of the charged offenses, defendant's character, his lack of community ties, and the nature and seriousness of the threat he posed—weighed in favor of finding no adequate conditions of release could be imposed. 725

ILCS 5/110-5(a)(1), (3)(A), (4) (West 2024). Moreover, the inability to monitor this particular defendant's Internet usage also supported a finding that no conditions could be imposed. *See, e.g.*, *People v. Popovich*, 2025 IL App (4th) 250196, ¶ 21 (finding, in part, that the "inability to monitor defendant's social media and Internet usage *** supports the conclusion there are no conditions *** that could mitigate the serious threat defendant poses"). Accordingly, we find the court did not err in determining no conditions of release could be imposed to mitigate the serious threat defendant posed to the safety of others in the community.

¶ 40                                    III. CONCLUSION

¶ 41         For the reasons stated, we affirm the trial court's judgment.

¶ 42         Affirmed.